NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

WENTWORTH INSTITUTE and Wentworth College of Technology, Inc., Respondent.

No. 74–1219.

United States Court of Appeals, First Circuit.

Argued Nov. 4, 1974.

Decided March 31, 1975.

Aileen A. Armstrong, Atty., Washington, D. C., with whom Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick H. Hardin, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and William H. DuRoss, III, Atty., Washington, D. C., were on brief, for petitioner.

Woodley B. Osborne and Carolyn I. Polowly, Washington, D. C., on brief for American Assn. of University Professors, amicus curiae.

Duane R. Batista, Boston, Mass., with whom Nutter, McClennen & Fish, Boston, Mass., was on brief, for respondent.

Charles Kelso and Fisher & Phillips, Atlanta, Ga., on brief for the University of Miami (Florida), amicus curiae.

Jerome Medalie, John E. Gorman, and Widett & Widett, Boston, Mass., on brief for Northeastern University, amicus curiae.

Before ALDRICH, McENTEE and CAMPBELL, Circuit Judges.

LEVIN H. CAMPBELL, Circuit Judge.

◼ The National Labor Relations Board applies for enforcement of its order finding Wentworth Institute and Wentworth College of Technology to have refused to bargain with the certified representative [1] of its full-time faculty, and directing Wentworth to bargain with the union. Underlying this dispute between the Board and Wentworth is a major change in Board policy announced in 1970 in Cornell University, 183 N.L.R.B. 329. Ending a long-time refusal to assert jurisdiction over employers like Wentworth, see Trustees of Columbia University, 97 N.L.R.B. 424 (1951), the Board declared in Cornell, "[W]e shall no longer decline to assert jurisdiction over [nonprofit educational] institutions as a class." 183 N.L.R.B. at 331. The questions now before us are whether under the National Labor Relations Act, 29 U.S.C. § 141 et seq., the Board has jurisdiction over private nonprofit institutions of higher education, and, if so, whether the Wentworth faculty included in the unit are "employees" within the meaning of the Act.

We summarize the pertinent facts. Wentworth, located in Boston, Massachusetts, operates a two-year program in engineering technology at the "Institute" and a third and fourth-year program leading to a Bachelor of Science degree at the newer, smaller "College". On March 12, 1973, the union filed a representation petition with the Board for an election among Wentworth's full-time faculty members at the two divisions to determine whether the union would be certified as their bargaining representative. Wentworth opposed the petition.

At the representation hearing, there was testimony that final decisions on policy and personnel at Wentworth are made by its Board of Trustees and administration. Its chief administrative officer is its president. The provost is the head academic officer at the Institute, and the senior dean of instruction and two other deans of instruction are responsible for academic matters in departments. Members of the College faculty report to the dean of the college. (By stipulation the foregoing officers were excluded from the unit.)

Department heads at the Institute (also excluded from the unit) are appointed by the administration on one-year contracts, renewable indefinitely and not rotating. They make recommendations about faculty appointments, renewals, terminations, and salaries to a dean, who reports to the provost, who reports to the president. The administration sets salary guidelines and budgets for the department heads to follow in making recommendations, which are usually accepted. Department heads and the deans meet once a month to discuss appointments and allocation of faculty among departments.

The College has about 14 full-time faculty members, the Institute about 100. All of them have one-year contracts. The faculty senate may make recommendations on policy matters, but by its own constitution these do not bind the administration and trustees. The faculty holds four meetings a year, the agenda being generally drawn up by the provost. There was evidence that the following actions developed in conjunction with faculty meetings: the administration polled the faculty as to preferences towards class hours at the Institute and the academic calendars, and the results played a part in the final decision. The faculty was consulted on final examination and graduation requirements. The president discussed tenure with the faculty, but the administration of trustees took no action. The administration met with the executive committee of the faculty senate to discuss class hours, the academic calendar, and methods and timing for the payment of faculty.

There are a number of faculty committees at Wentworth. The Curriculum, Development and Planning Committee reviews ideas for the Institute submitted

---

1. The Massachusetts Federation of Teachers, American Federation of Teachers, AFL–CIO.

by individuals or groups, and makes recommendations thereon to the deans and president. There is no evidence the committee's recommendations are generally given effect or even presented to the entire faculty. Another committee schedules final examinations. The Athletic Committee promotes athletics and schedules activities in the gymnasium. The Faculty Welfare Committee administers a small fund for expressing sympathy to ill people at the Institute. The Student Status and Grades Committee reviews disciplinary problems and student standing at the Institute. Another committee promotes harmonious relations between students and faculty at the two divisions of Wentworth. The Radiological Safety and Civil Defense Committee was established at the Institute to satisfy the Atomic Energy Commission safety requirements. A committee oversees the administration of the scholarship and loan program at the Institute, but it is unclear whether the committee as a whole has the final decision on awards. The High School Personnel Committee arranges two annual promotional dinners for high school students.

After the hearing the Board's Regional Director, ruling that Wentworth's operations came within the Board's statutory jurisdiction and its own standards,[2] found that an appropriate bargaining unit consisted of all full-time day faculty, including a research associate, the librarians, and two faculty members who spent part of their time working on curriculum development and general planning at the College. Excluded from the unit were department heads, part-time faculty, the registrar, athletic department employees, laboratory assistants, employees under the dean of students,

clerical employees, executives, guards, and supervisors.

The Board denied review of this decision on the ground that no substantial issues were raised. The union won the subsequent election by a 57–39 vote, and the Board certified the union as the exclusive bargaining agent for the unit. As is the accepted method for challenging the Board's rulings in representation proceedings, Wentworth refused to bargain with the union and was found to have violated sections 8(a)(5) and 8(a)(1) of the Act, 29 U.S.C. § 158(a)(5) & (1), in the ensuing unfair labor practice proceeding.

## NLRB JURISDICTION OVER NON-PROFIT EDUCATIONAL INSTITUTIONS

■ The statutory grant of jurisdiction to the Board extends to all questions of representation "affecting commerce". NLRA §§ 9(c)(1), 10(a), 29 U.S.C. §§ 159(c)(1), 160(a). Wentworth opposes Board jurisdiction on the ground that although no exclusion appears in the Act, an exclusion for private nonprofit higher educational institutions must be implied from the legislative history and the Board's earlier policy. This is a difficult position to sustain and we do not accept it, although we are not unsympathetic to the concerns of Wentworth and the private nonprofit educational institutions which have filed amicus briefs herein. We do not believe that the Act, clear on its face, can be understood to preclude jurisdiction.

The Board maintains that Wentworth is an "employer" within the Act,[3] Congress having excluded certain types of employers (including nonprofit hospitals)[4] in the Taft-Hartley legisla-

2. Wentworth's gross volume of income for unrestricted use exceeds one million dollars annually, and Wentworth receives goods valued at over $50,000 directly from points outside Massachusetts.

3. Section 2(2), 29 U.S.C. § 152(2), which defines "employer", in effect establishes the employers over which the Board may assert

jurisdiction since the unfair labor practices in § 8(a) and employee representation petitions in § 9(c)(1) apply only against employers within the meaning of the Act.

4. The exclusion of nonprofit hospitals has recently been repealed. P.L. 93–360, effective August 25, 1974.

tion, but made no exception for nonprofit institutes and colleges. Wentworth's annual unrestricted revenues and its out-of-state purchases, note 2 *supra*, are in amounts held, in other settings, to establish more than a minimal impact on commerce. *See, e. g.,* NLRB v. Benton & Co., 313 F.2d 629, 630 (5th Cir. 1963); NLRB v. Stoller, 207 F.2d 305, 307 (9th Cir. 1953), cert. denied, 347 U.S. 919, 74 S.Ct. 517, 98 L.Ed. 1074 (1954). The Supreme Court has stated that "Congress intended to and did vest in the Board the fullest jurisdictional breadth constitutionally permissible under the Commerce Clause". NLRB v. Reliance Fuel Oil Corp., 371 U.S. 224, 226, 83 S.Ct. 312, 313, 9 L.Ed.2d 279 (1963), and cases cited therein.

Given the sweep of the statute, the Board sees no impediment to what it concedes was a major policy shift in 1970. The declared purpose of the Act is to eliminate obstructions upon commerce caused by labor unrest, 29 U.S.C. § 151, and in dealing with employer operations whose effect upon commerce has grown over time the Board believes that it is endowed with discretion to exercise a fuller measure of its conferred jurisdiction. Thus the shift in 1970 was, in its view, not a *volte-face* but an exercise of continuing responsibility. In *Cornell, supra,* and in later pronouncements, the Board found that today's colleges and universities affect commerce more than they once did, being now more involved in private commercial activity, and receiving extensive federal support.[5] Shortly after *Cornell*, the Board formalized its intentions to exercise jurisdiction over nonprofit educational institutions grossing over $1,000,000 annually. *See* 35 Fed.Reg. 18370, 18371. Jurisdiction was asserted over professional campus personnel. *See, e. g.,* C. W. Post Center of Long Island University, 189 N.L.R.B. 904 (1971).

Against the foregoing, Wentworth urges us to read the Act in light of an alleged congressional understanding to exclude nonprofit employers. The House bill in 1947 was worded so as to exempt a number of categories of nonprofit employers, including nonprofit educational institutions. H.R. 3020, reprinted in H.R.Rep. No. 245, 80th Cong., 1st Sess. 47 (1947). The Senate committee's version contained no such exemption, although an amendment was accepted by the full Senate excluding nonprofit hospitals. When the two versions were reconciled so as to omit any express exemption of nonprofit institutions except hospitals, the Conference Report stated:

> "The other nonprofit organizations excluded under the House bill are not specifically excluded in the conference agreement, for only in exceptional circumstances and in connection with purely commercial activities of such organizations have any of the activities of such organizations or of their employees been considered as affecting commerce so as to bring them within the scope of the National Labor Relations Act."

H.Conf.Rep. No. 510, 80th Cong., 1st Sess. 32 (1947), U.S.Code Cong.Serv. 1947, pp. 1135, 1137. Wentworth says this is a "clear manifestation of a Congressional intent not to have the Act apply to nonprofit Institutes of Higher Learning". It argues that Congress rejected the House version merely to keep alive the Board's discretion to distinguish between the covered "purely commercial" activities of such organizations and their exempt activities. The trouble with this argument is that it is speculative and not solidly established by the legislative history. The supposed Board practice prior to 1947 of taking jurisdiction "only in exceptional cases and in connection with purely commercial activities" seems never to have existed. *See*

---

5. For example, Congress' extension of coverage of the Fair Labor Standards Act to private nonprofit universities in 1966 reflected, in the Board's view, congressional recognition of the expanded role of such institutions in commerce. Cornell University, 183 N.L.R.B. 329, 332–34 (1970).

*generally* Sherman & Black, The Labor Board and the Private Nonprofit Employer: A Critical Examination of the Board's Worthy Cause Doctrine, 83 Harv.L.Rev. 1323, 1331–37 (1970) and cases cited therein. *See, e. g.,* Christian Bd. of Publication, 13 N.L.R.B. 534 (1939), enforced, 113 F.2d 678 (8th Cir. 1940); American Medical Ass'n, 39 N.L. R.B. 385 (1942). This notion is said to have been picked up by the House conferees from the House committee's minority report and may have been a way of saving face after conceding to the Senate. *See* Sherman & Black, *supra.*

Moreover, a very possible, perhaps the most obvious, interpretation of the rejection of the House exclusion would be that Congress meant to include nonprofit organizations. It is, in any event, doubtful practice to exalt isolated glosses above the statutory text. That legislators were not of one mind is demonstrated by the comments of Senator Taft, cosponsor of the bill and committee chairman, to the Senate on the amendment to exclude nonprofit hospitals. He said his committee had felt "hospitals were not engaged in interstate commerce and that their business should not be so construed. We rather felt [the amendment] would open up the questions of making other exemptions." 93 Cong.Rec. 4997 (1947). Other legislators were obviously not so optimistic that hospitals would be left alone, and insisted upon the amendment. It is, moreover, not entirely easy to reconcile the Senate committee's fear of "other exemptions" with the argument that we should now assume the existence of other exemptions.

█ The Board, it is true, relied upon the Conference Report when, in 1951, it declined jurisdiction over clerical employees in the Columbia University libraries. Trustees of Columbia Universi-

ty, 97 N.L.R.B. 424 (1951).[6] But the Board never ruled that it lacked jurisdiction—only that the Conference Report language was a "guide", presumably to the exercise of its discretion. Congressional silence after that qualified pronouncement casts little light on the subject of jurisdictional outer limits. *See, e. g.,* NLRB v. Bell Aerospace Co., 416 U.S. 267, 285–89, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974); *cf.* Chemehuevi Tribe of Indians v. FPC, —— U.S. —— at ——, 95 S.Ct. 1066 at 1075, 43 L.Ed.2d 279 (1975). With respect to the Board's own precedents, it is not an abuse of discretion for the Board to reappraise its position in light of developments in society, as long as its new construction is consistent with the language and tenor of the Act. The Supreme Court has recently stated:

"The use by an administrative agency of the evolutional approach is particularly fitting. To hold that the Board's earlier decisions froze the development of this important aspect of national labor law [right to have union representative present at employer investigative interview] would misconceive the nature of administrative decision-making. ' "Cumulative experience" begets understanding and insight by which judgments . . . are validated or qualified or invalidated. The constant process of trial and error, on a wider and fuller scale than a single adversary litigation permits, differentiates perhaps more than anything else the administrative from the judicial process.' NLRB v. Seven-Up Bottling Co., 344 U.S. 344, 349, 73 S.Ct. 287, 290, 97 L.Ed. 377 (1953)."

NLRB v. J. Weingarten, Inc., 420 U.S. 251 at 265–266, 95 S.Ct. 959 at 967–968, 43 L.Ed.2d 171 (1975).

█ Wentworth seems also to argue that a finding of Board jurisdiction is

---

**6.** The Board wrote,

"Regardless of whether or not the conference report literally recites the Board's practice prior to the amendment of the Act, it does indicate approval of and reliance upon the Board's asserting jurisdiction over non-

profit organizations 'only in exceptional circumstances and in connection with purely commercial activities of such organizations.' Whether or not this language provides a mandate, it certainly provides a guide." 97 N.L.R.B. at 427.

precluded because, as to faculty members, it leads to results far beyond anything Congress could possibly have intended. Insofar as this is an argument addressed to jurisdiction and not simply to whether faculty are employees under the Act, we can only say that while there are good arguments against permitting faculty members to bargain collectively, the converse is not so unthinkable as to justify our writing into the Act a jurisdictional exclusion where none now exists. Moreover we could not justify denying coverage of the Act to nonteaching as well as faculty employees, which would be the result of a finding of no jurisdiction. *Cf.* Hotel Employees Local 255 v. Leedom, 358 U.S. 99, 79 S.Ct. 150, 3 L.Ed.2d 143 (1958); Office Employees Local 11 v. NLRB, 353 U.S. 313, 77 S.Ct. 799, 1 L.Ed.2d 846 (1957).

■ Wentworth argues that before assuming jurisdiction over nonprofit educational institutions the Board should have conducted a rulemaking. Adjudication is said, in effect, to have led the Board down the garden path without the benefit of a wide spectrum of views which would permit it to grasp before too late the ramifications of its decision upon universities and colleges.[7] *See* Kahn, The NLRB & Higher Education: The Failure of Policymaking Through Adjudication, 21 U.C.L.A.L.Rev. 63 (1973). But the mode of proceeding rests primarily on the Board's informed discretion. SEC v. Chenery Corp., 332 U.S. 194, 203, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); *Bell Aerospace, supra,* 416 U.S. at 294, 94 S.Ct. 1757. *See generally* 29 U.S.C. § 164(c)(1). While rulemaking may have been a preferable course, the Board did not exceed the limits of its authority. *See* NLRB v. Wyman-Gordon Co., 394 U.S. 759, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969).

■ We hold that the Board has jurisdiction over nonprofit higher educational institutions, and turn next to whether the Board could properly conclude that Wentworth's faculty members were "employees" under the Act.

## WENTWORTH FACULTY AS "EMPLOYEES"

Wentworth contends that the Act should not be read to include college faculty among the ranks of workers in the industrial world who are "employees" under the Act. An educational institution's goals of teaching and advancing knowledge are said to be so closely dependent upon each faculty member that the trustees and administration, who have ultimate authority, as a matter of course delegate to the faculty or its representatives varying amounts of authority and influence over educational policy and the government of the institution. This relationship is said to stand in contrast to the normal adversarial positions of employees and a monolithic management, and is illustrated by the rarity of faculty strikes which might disrupt commerce. Collective bargaining by an exclusive faculty bargaining agent under the rules of the Act will supposedly result in the erosion of academic freedom and meritocratic values, and in the substitution of adversarial attitudes for traditional collegiality and shared responsibility.

We do not take Wentworth's views lightly, and were we a legislature we might reach a different result. But we are unable to convince ourselves that all faculties of all private nonprofit institutions of higher learning in the nation are so situated as to fall outside the ranks of "employees" under the Act. Given wide differences in terms of service and responsibility, the focus must be upon each particular institution.

■ Section 2(3) provides that the "term 'employee' shall include any employee, and shall not be limited to the employees of a particular employer, unless the Act explicitly states otherwise", and it excludes certain workers from the

---

7. A rulemaking alternative would be less suited to the Board's determination that faculty members of a given institution are "employees" within the Act, *see infra.* Adjudication permits attention to the differing roles and responsibilities of faculty at each place.

definition. The Act covers the "professional employee", separately defined in section 2(12) as,

> "(a) any employee engaged in work (i) predominantly intellectual and varied in character as opposed to routine mental, manual, mechanical, or physical work; (ii) involving the consistent exercise of discretion and judgment in its performance; (iii) of such a character that the output produced or the result accomplished cannot be standardized in relation to a given period of time; (iv) requiring knowledge of an advanced type in a field of science or learning customarily acquired by a prolonged course of specialized intellectual instruction and study in an institution of higher learning   . . ."

We see no reason to reject the Board's findings that the members of the Wentworth faculty included in the unit come within this definition and do not belong to either of two excluded subcategories, namely supervisors or managerial employees.

■■ A supervisor is defined in section 2(11) as,

> "any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment."

Even if this provision is read disjunctively, so that possession of authority for one function is sufficient for finding supervisory status, a supervisor must possess authority and use independent judgment in exercising his supervisory authority on behalf of management. *See,* *e. g.,* NLRB v. Magnesium Casting Co., 427 F.2d 114 (1st Cir. 1970), aff'd, 401 U.S. 137, 91 S.Ct. 599, 27 L.Ed.2d 735. In the instant case the Regional Director excluded from the unit the deans and department heads as supervisory personnel involved in the hiring, assigning, and directing of faculty. There is little evidence that those remaining in the unit would fit in this category.

The other excluded category is that of managerial employees. Although no such group is mentioned in the Act, the Board has traditionally excluded them from coverage, and the Supreme Court has held that the Board must adhere to this interpretation. *Bell Aerospace, supra.* The Court cited with approval the Board's definition of managerial employees as those who formulate, determine, and effectuate an employer's policies and decisions. *See* Eastern Camera & Photo Corp., 140 N.L.R.B. 569, 571 (1963).

■ On the record in this case, the Board was entitled to find that neither the Wentworth faculty nor its committees possess substantive authority. The structure is hierarchical, and there is no evidence of an instance of significant faculty impact collectively or individually on policy or managerial matters other than the scheduling of exams, classes, and other such routine matters. The two individuals included in the unit who come closest to satisfying the definition of managerial employees would be the two faculty members at the College who spent part time assisting with planning. However, there is insufficient evidence indicating responsibility on their part over matters of substance to compel a finding that they are managerial employees.

We therefore sustain the Board's finding that the faculty members included in the Wentworth unit were not managerial employees. In so doing, we do not comment on the Board's developing views on the significance of a substantial faculty role in decisions on curricula, admissions, hiring, degree requirements, and other educational policy matters. *See, e. g.,* New York University, 205 N.L.R.B. No. 16 (1973); Adelphi University, 195 N.L.R.B. 639 (1972); Fordham University, 193 N.L.R.B. 134 (1971); C. W. Post, *supra. Compare* Kahn, *supra,*

*with* Finkin, The NLRB in Higher Education, 5 U.Tol.L.Rev. 608 (1974). Neither do we suggest that faculty members with different relationships and status than those herein are necessarily included employees under the Act.

Wentworth does not challenge the bargaining unit as being inappropriate, and we think the Board's exclusion of part-time faculty and certain non-teaching personnel was proper on the ground of no mutuality of interest.

Enforcement granted.