NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

The KENT COUNTY ASSOCIATION FOR RETARDED CITIZENS d/b/a J. Arthur Trudeau Center, Respondent.

No. 78–1263.

United States Court of Appeals,
First Circuit.

Argued Nov. 9, 1978.
Decided Dec. 28, 1978.

---

**20**

Michael B. Nicholson, Atty., Washington, D. C., with whom John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., were on brief, for petitioner.

Gary R. St. Peter, Providence, R. I., with whom William J. Sheehan, and Adler, Pollock & Sheehan, Inc., Providence, R. I., were on brief, for respondent.

Before COFFIN, Chief Judge, ALDRICH and BOWNES, Circuit Judges.

COFFIN, Chief Judge.

This case is before us on the application of the National Labor Relations Board, pursuant to § 10(e) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 160(e), for enforcement of its October 1977 order against the Kent County Association for Retarded Citizens d/b/a J. Arthur Trudeau Center (the "Center"), ordering the Center to cease and desist from refusing to bargain collectively with its certified union in violation of §§ 8(a)(5) and (a)(1) of the Act, 29 U.S.C. §§ 158(a)(5), (a)(1), and to take affirmative action to remedy certain unfair labor practices. In response, the Center contests the Board's jurisdiction over its labor relations, as it did below, in both the representation and unfair labor practice proceedings before the Board.[1]

The Center is a nonprofit Rhode Island corporation, operating a facility for the rehabilitation and training of retarded children and adults. It claims, first, that unless it can be classified as a "health care institution", its status as a charitable, nonprofit organization removes it from the ambit of the term "employer", § 2(2) of the Act, 29 U.S.C. § 152(2), and thus insulates it from the Board's jurisdiction, under the Act, 20 U.S.C. §§ 159(c)(1), 160(a). Second, it argues that even if the Board can properly assert jurisdiction over the Center as an "employer", there is no substantial evidence in the record to show that the Center is engaged in commerce, as defined by sections 2(6) and 2(7) of the Act, 29 U.S.C. §§ 152(6), (7). We find that neither assertion has merit and grant the Board's application for enforcement of its order.

1. *The Board's jurisdiction over nonprofit, charitable institutions*

■ In its proceedings below, the Board rejected the Center's narrow view of its jurisdictional reach over nonprofit charitable institutions, and "[w]ithout deciding whether the Employer is a health care insti-

---

1. In the unfair labor practice hearing the Board found that the jurisdictional issues had been litigated and decided in the underlying representation proceeding. Finding no persuasive reason to reconsider those issues, the Board granted the union's motion for summary judgment. Subsequently the Center filed a motion for reconsideration which was denied.

tution", found that "it will effectuate the policies of the Act to assert jurisdiction inasmuch as the Employer is expected to have gross annual revenues in excess of $250,000." 228 N.L.R.B. 222 (1977). The $250,000 gross revenue amount was drawn from the Board's recent decisions applying this dollar yardstick for asserting jurisdiction over "day care centers, institutions involving specialized care and custody of children". *The Rhode Island Catholic Orphan Asylum, a/k/a St. Aloysius Home*, 224 N.L.R.B. 1344, 1345 n. 6 (1976); *Salt & Pepper Nursery School & Kindergarten No. 2*, 222 N.L.R.B. 1295 (1976).

By asserting jurisdiction over the Center, although nonprofit and charitable in character, the Board acted in accordance with its *St. Aloysius Home* decision, *supra*, in which it altered its earlier policy of declining to exercise jurisdiction in such cases. *See Ming Quong Children's Center, Inc.*, 210 N.L.R.B. 889 (1974). In *St. Aloysius Home, supra*, 224 N.L.R.B. at 1344, it comprehensively explained its earlier policy and the reason for its abandonment:

"Traditionally, the Board has declined jurisdiction over this type of employer simply because it is a non-profit institution whose activities are primarily noncommercial in nature and intimately connected with the charitable purposes of its institution. *Ming Quong* was premised on the theory that, under the definition of employer in Section 2(2) of the Act, the Board has the authority to decline jurisdiction over non-profit charitable organizations by virtue of the nature of the organization itself and without specifically examining the impact of its activities on interstate commerce. However, it was recognized that when such an organization had a 'massive impact on interstate commerce' assertion of Board jurisdiction was warranted. But nothing short of that standard was deemed sufficient to override the general policy of declining jurisdiction over such eleemosynary institutions based on interpretation of Section 2(2).

"Whatever the soundness of such a policy, its underpinnings were removed by the [1974] health care amendments of the Act. These amendments deleted the only reference to the exclusion from Board jurisdiction of charitable organizations to be found in Section 2(2) of the Act, i. e., the one for nonprofit hospitals and left the broad coverage of that section applicable to all employers, except for certain exclusions not relevant here."

It is the Center's position that *St. Aloysius Home* was decided incorrectly as a matter of law and that the Board should be held to its contrary stand in *Ming Quong Children's Center, Inc., supra*. Relying on the *St. Aloysius Home* dissent of then Chairwoman Murphy, it argues that legislative history leading to the 1947 Taft-Hartley Amendments, which enacted the section 2(2) exemption for nonprofit hospitals, undercuts the Board's capacity to assert jurisdiction over nonprofit charitable organizations, and that the 1974 Amendments dropping that exemption do not alter the Board's incapacity to change its position.

There was initial disagreement within Congress over the 1947 exclusion of nonprofit charitable employers from the Board's jurisdictional reach. Initially, the House bill exempted a number of categories of nonprofit employers. The Senate committee's version contained no such exemption. Compromise was reached by the addition of an amendment to the Senate version, excluding only nonprofit hospitals, and the Conference Report stated:

"The other nonprofit organizations excluded under the House bill are not specifically excluded in the conference agreement, for only in exceptional circumstances and in connection with purely commercial activities of such organizations have any of the activities of such organizations or of their employees been considered as affecting commerce so as to bring them within the scope of the National Labor Relations Act." H.Conf. Rep.No. 510, 80th Cong., 1st Sess. 32 (1947), U.S.Code Cong.Serv. 1947, pp. 1135, 1137.

The Board at one time relied on the language of this Conference Report as signalling congressional approval of its declination of jurisdiction not only over nonprofit hospitals but over most other nonprofit employers as well. *See Office Employers International Union, Local No. 11, AFL–CIO v. NLRB*, 353 U.S. 313, 318–19, 77 S.Ct. 799, 1 L.Ed.2d 846 (1957).

The Center relies on this passage from the Conference Report for the proposition that Congress intended to eliminate the Board's jurisdiction over nonprofit charitable institutions unless "exceptional" circumstances exist, although it declined to write that exemption into the statute. This argument is not unfamiliar to this circuit. In *NLRB v. Wentworth Institute*, 515 F.2d 550 (1st Cir. 1975), we determined whether a statutory exclusion for a private nonprofit educational institution should be implied from the legislative history leading to passage of the Taft-Hartley Amendments. Starting from the premise that "Congress intended to and did vest in the Board the fullest jurisdictional breadth constitutionally permissible under the commerce clause", *NLRB v. Reliance Fuel Oil Corp.*, 371 U.S. 224, 226, 83 S.Ct. 312, 313, 9 L.Ed.2d 279 (1963), we concluded that there was no basis for reading exemptions into the section 2(2) definition of employer that simply were not there. *Id.* at 553–54. We found the legislative history insufficient to disturb that conclusion:

> "The supposed Board practice prior to 1947 of taking jurisdiction 'only in exceptional cases and in connection with purely commercial activities' seems never to have existed. *See generally* Sherman & Black, The Labor Board & Private Nonprofit Employer: A Critical Examination of the Board's Worthy Cause Doctrine, 83 Harv.L.Rev. 1323, 1331–37 (1970) . . This notion is said to have been picked up by the House conferees from the House committee's minority report and may have been a way of saving face after conceding to the Senate. . . .
>
> "Moreover, a very possible, perhaps the most obvious, interpretation of the rejection of the House exclusion would be that

Congress meant to include nonprofit organizations. It is, in any event, doubtful practice to exalt isolated glosses above the statutory text." *Id.* at 554–55.

The Center contends that our holding in *NLRB v. Wentworth Institute, supra*, pertaining to higher educational institutions, *id.* at 556, cannot be extended to nonprofit institutions like the Center, for the care and training of retarded individuals. In *Wentworth Institute* we recognized that the Board, in asserting jurisdiction over institutions of higher learning, *see Cornell University*, 183 N.L.R.B. 329 (1970), *overruling Trustees of Columbia University*, 97 N.L.R.B. 424 (1951), had found that "today's colleges and universities affect commerce more than they once did, being now more involved in private commercial activity, and receiving extensive federal support." *NLRB v. Wentworth Institute, supra*, 515 F.2d at 554. Because the Board in *St. Aloysius Home*, 224 N.L.R.B. 1344 (1976), did not likewise find that nonprofit institutions "involving specialized care and custody of children" now affect commerce far more than they once did, the Center maintains that the Board improperly switched course when it overruled *Ming Quong Children's Center, Inc.*, 210 N.L.R.B. 899 (1974), and thus that our reasoning in *Wentworth Institute* is inapplicable to this case.

We find the Center's attempts to distinguish *Wentworth Institute, supra*, unpersuasive. Although it is true that the Board, in asserting jurisdiction over nonprofit institutions of higher learning, *Cornell University*, 183 N.L.R.B. 329 (1970), found that the impact of such institutions on interstate commerce, as a class, had altered significantly, and that in exercising its jurisdiction over institutions such as the Center, it found that the nonprofit-profit distinction had lost its validity and discarded it completely in favor of a case by case determination of an institution's impact on commerce, we see no significance in the distinction. "Reviewing courts are of course not 'to stand aside and rubber stamp' Board determinations that run contrary to the language or tenor of the Act", *NLRB v. Wein-*

*garten, Inc.,* 420 U.S. 251, 266, 95 S.Ct. 959, 968, 43 L.Ed.2d 171 (1975), but there is nothing in the Act, nor in the little if any gloss provided by the 1947 Conference Report, that prohibits the Board's jurisdiction here or mandates that its reason for shifting from a declination to an assertion of jurisdiction over a group of nonprofit, charitable institutions be a class-wide change in impact on commerce. The statute at no time compelled the Board to decline jurisdiction over institutions such as the Center, and the Board need not make such a stringent showing to assert jurisdiction now.

The basis for the Board's change of policy is clear and, it seems to us, sound. In *St. Aloysius Home,* 224 N.L.R.B. 1344 (1976), it determined that the underpinnings for its policy of distinguishing between profit and nonprofit institutions, "whatever the soundness of such a policy", had been swept away when the Congress, in 1974, enacted the Health Care amendments dropping the Taft-Hartley exclusions for nonprofit hospitals:

"[T]here appears to be no present basis for giving special consideration to the charitable function or activities of institutions outside the health care field, when institutions within the coverage of the [1974] amendments may serve an equally charitable purpose but are specifically made subject to the Board's jurisdiction." *Id.* at 1345.

In *St. Aloysius Home,* as in *Cornell University,* the Board "reached a fair and reasoned balance upon a question within its special competence, its newly arrived at construction of [its exercise of jurisdiction] does not exceed the reach of [the Act], and the Board has adequately explicated the basis of its interpretation." *NLRB v. Weingarten, Inc., supra,* 420 U.S. at 267, 95 S.Ct. at 968. Nor can the Board's change of policy be described as an abuse of its discretion: "with respect to our national labor policy, some degree of change is essential to keep that policy responsive to the problems of complex industrial life." *NLRB v. Children's Baptist Home of Southern California,* 576 F.2d 256, 260 (9th Cir. 1978); *see NLRB v. Weingarten, Inc., supra,* 420 U.S. at 265–66, 95 S.Ct. 959; *NLRB v. Wentworth Institute, supra,* 515 F.2d at 555.

2. *The Board's finding that the Center was engaged in interstate commerce*

The Board found that for the 1976 calendar year, the Center had projected revenues of $620,674. Applying its $250,000 gross annual revenues yardstick for "day care centers, institutions involving specialized care and custody of children", *St. Aloysius Home,* 224 N.L.R.B. 1344 (1976); *Salt & Pepper Nursery School & Kindergarten No. 2,* 222 N.L.R.B. 1295 (1976), it determined that exercising jurisdiction over the Center would effectuate the purposes of the Act. The Center recognizes that its projected revenues exceed the $250,000 yardstick, but urges that its operations in addition must satisfy the Board's jurisdictional standard for retail enterprises—that the employer have a gross annual volume of business of more than $500,000 and out-of-state purchases of more than $50,000, *Abilities and Goodwill, Inc.,* 226 N.L.R.B. 1224 (1976). Contrary to its apparent concession at the representation proceeding, it argues that the Board has failed to make the $50,000 "inflow-outflow" showing. The Board counters that its $250,000 projected revenue standard for institutions like the Center and its retail enterprises standard are alternative tests for assessing an institution's affect on commerce and that, in any event, the Center's operations satisfy both tests.

Our reading of recent Board decisions corroborates the Board's assertion that, at present, it utilizes a variety of alternative jurisdictional tests, sometimes asserting jurisdiction on the basis of gross revenue amounts alone. *See, e. g., Abilities and Goodwill, Inc.,* 226 N.L.R.B. 1224 (1976); *St. Aloysius Home,* 224 N.L.R.B. 1344 (1976); *Beverly Farm Foundation, Inc.,* 218 N.L.R.B. 1275 (1975). And although a case conceivably could arise in which an institution, having the requisite amount of gross revenue to satisfy the jurisdictional yardstick, nonetheless was a wholly local operation, leaving the Board without jurisdiction, *see International Longshoremen, Local 113,* 124 N.L.R.B. 813

(1959), we are not faced with such a situation here. Although the Board based its exercise of jurisdiction in the representational proceeding on the basis of the gross revenue amount alone, the record amply illustrates that the Center has more than a *de minimis* impact on the flow of interstate commerce. The Board need show no more. *See NLRB v. International Rice Milling Co., Inc.,* 341 U.S. 665, 684–85, 71 S.Ct. 961, 95 L.Ed. 1277 (1951); *NLRB v. Fainblatt,* 306 U.S. 601, 607, 59 S.Ct. 668, 83 L.Ed. 1014 (1939).

■ The Center vigorously disputes the findings in the record which support the Board's assertion of affecting commerce jurisdiction. In particular, it faults the Board's finding that $64,539 in federal CETA funds were received by the Center in 1976, because it was based on projections for a large part of the year without evidence that the funds actually were received.[2] It objects as well to the finding that the Center spent approximately $61,700 to purchase supplies in interstate commerce because it was based on a statement of the then Center's counsel at the representation hearing that 10 per cent of the 1976 budget—approximately $617,000— "may" be "expended in interstate commerce for supplies, materials and other things . . . ."

Although the anticipated receipt of 1976 CETA funds alone, given the fact that their continued flow to the Center apparently was an uncertainty, might be somewhat unreliable as evidence, we find nothing amiss in the Board's reliance on counsel's statement that 10 per cent of the Center's budget probably would be expended in interstate commerce. We therefore hold that there exists substantial evidence to support the conclusion that the Center's operation had more than a *de minimis* impact on interstate commerce.[3]

■ The Center's final contention is that its activities, "thoroughly vocational . .

in nature", distinguish it from the institutions in *St. Aloysius Home* and *Salt & Pepper Nursery School & Kindergarten No. 2, supra,* and render those cases and their $250,000 jurisdictional yardstick inapplicable. Again we disagree. The institution in *St. Aloysius Home* was engaged in activities—the care, training and education of children with behavioral problems—similar to the Center's. The fact that a larger number of the Center's clients were adults than were children (although three of its four programs were for persons under the age of 21), does not preclude the Board from using the yardstick for institutions involved in the specialized care and custody of children. Contrary to the Center's understanding, the Board, acting within the bounds of the Act, enjoys wide latitude in the exercise of its jurisdiction.

*The Board's application for enforcement of its October 1977 order is granted.*

---

**2.** It is clear that the Center received CETA funds for 1975, but the record contains no evidence of their amount.

**3.** Although the Board did not rely on this factor in justifying its exercise of jurisdiction, $36,000

of the Center's projected revenues for 1976 were payments for the contractual services rendered by participants in the Center's occupational training program to companies stipulated to be engaged in interstate commerce.