575 F.2d 301
 98 L.R.R.M. (BNA) 2070, 83 Lab.Cas. P 10,520
 TRUSTEES OF BOSTON UNIVERSITY, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
and
Boston University Chapter, American Association of
University Professors, Intervenor.
BOSTON UNIVERSITY CHAPTER, AMERICAN ASSOCIATION OF
UNIVERSITY PROFESSORS, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
and
Trustees of Boston University, Intervenor.
TRUSTEES OF BOSTON UNIVERSITY, Plaintiff-Appellant,
v.
NATIONAL LABOR RELATIONS BOARD, Defendant-Appellee.
 Nos. 77-1143, 77-1365 and 77-1226.
 United States Court of Appeals,
First Circuit.
 April 13, 1978.
 
 Alan S. Miller, Boston, Mass., (argued), with whom Stoneman, Chandler & Miller, Boston, Mass., were on brief, for Trustees of Boston University, petitioner in 77-1143.
 Woodley B. Osborne, Washington, D. C., with whom David M. Rabban, Washington, D. C., and Matthew Finkin, Dallas, Tex., were on brief, for Boston University Chapter, American Association of University Professors, petitioner in 77-1365.
 Patrick J. Szymanski, Washington, D. C., with whom John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Carl L. Taylor, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Aileen A. Armstrong, Asst. Gen. Counsel for Sp. Litigation, Robert G. Sewell, and Linda Dreeben, Washington, D. C., were on briefs, for N. L. R. B., in all cases.
 Richard W. Gleeson, Boston, Mass., (argued), with whom Stoneman, Chandler & Miller were on brief, for Trustees of Boston University, in 77-1226.
 Before COFFIN, Chief Judge, and CAMPBELL and BOWNES, Circuit Judges.
 BOWNES, Circuit Judge.
 
 
 1
 The three cases before us all present issues which developed during the union organizational campaign and subsequent National Labor Relations Board certification election and as a result of Boston University's objections to the election and consequent failure to bargain with the Union. The union involved is the American Association of University Professors (AAUP) and its Boston University chapter. The issues are:
 
 
 2
 1. Whether the Board abused its discretion in finding that the University's department chairpersons are neither supervisors within the meaning of Section 2(11) of the National Labor Relations Act, 29 U.S.C. § 152(11), nor managerial employees, see NLRB v. Bell Aerospace Co., 416 U.S. 267, 275, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974);
 
 
 3
 2. Whether the Board abused its discretion in excluding the faculties of law, medicine, and dentistry and part-time faculty from the bargaining unit;
 
 
 4
 3. Whether the Board erred in overruling the University's objection that an article in the April, 1975, issue of the AAUP Bulletin critical of the President of the University amounted to conduct which unfairly affected the election;
 
 
 5
 4. Whether the district court erred in ruling that material gathered by the Board during the course of its investigation of the University's objections to the certification election were exempt from the Freedom of Information Act under Exemption 7(A), 5 U.S.C. § 552(b)(7)(A); and
 
 
 6
 5. Whether the Board erred in denying the Union's request for attorney's fees, giving retroactive effect to any negotiated agreement, and other extraordinary relief.
 
 PROCEDURAL HISTORY
 
 7
 On October 18, 1974, the Union filed a petition with the Board for a representation election in a unit which was defined at the hearing as a unit of approximately 850 "full-time teaching faculty . . . , including department chairmen, certain academic program directors, nursing coordinators, faculty on leave and part-time faculty who have tenure or are on the tenure track at the University's Charles River campus, excluding faculty of the Law School, the Medical School, and the School of Graduate Dentistry." The University contended that department chairpersons should have been excluded from the bargaining unit and the faculty from the three professional schools and part-time faculty should have been included.
 
 
 8
 The Regional Director issued his decision on April 17, 1975, finding that the department chairmen were neither supervisors nor managerial employees and that the part-time faculty and the faculties of the three professional schools in question did not share a community of interest with the other faculties sufficient to require their inclusion.[1] Other points decided by the Regional Director are not before us.
 
 
 9
 The Regional Director directed an election and the Board denied the University's request for review. The election was held on May 14, and the ballot count on June 3 showed the Union the winner, 394-262, with 40 challenged ballots.
 
 
 10
 The University filed objections and supplemental objections contending that an article in the AAUP Bulletin misrepresented Boston University President John Silber's role in the firing of a professor at Texas University when Silber was Dean of its College of Arts and Sciences. The University requested a hearing on its objections, and the Union requested attorney's fees on the ground that the University's objections were frivolous.
 
 
 11
 After an administrative investigation, the Regional Director issued a supplemental decision, dated August 13, finding that the alleged misrepresentations were not sufficient to set aside the election even if found to be as alleged and, therefore, certified the Union as the collective bargaining agent for the unit. The Board denied review because the request for review "raised no substantial issues," but declined to award attorney's fees.
 
 
 12
 On August 7, the University refused to bargain with the Union as the exclusive bargaining agent for the unit. The Union filed an unfair labor practice charge, and the General Counsel issued a complaint on October 8 charging the University with refusing to bargain with a certified bargaining agent in violation of sections 8(a)(1) and (5) of the NLRA. The University's answer admitted the failure to bargain, but raised the affirmative defense that the Regional Director had erred in failing to include the three professional school faculty in the bargaining unit, in including the department chairpersons, and in overruling its election objections. In response to the General Counsel's motion for summary judgment on the issues, the Board issued a notice to show cause why the motion should not be granted. The Union filed a motion for specific relief on December 17, asking for an order requiring the University to give retroactive effect to any agreement regarding salaries or fringe benefits, to pay costs of attorney's fees and other litigation expenses, and several other extraordinary remedies in addition to the usual prospective bargaining order.
 
 
 13
 The University requested and received two extensions of time so that its answer to the notice to show cause would have been due on January 15. It filed its answer to the notice to show cause on December 2, opposing summary judgment for the reasons indicated earlier. The Board granted the motion for summary judgment.
 
 
 14
 On January 12, the University filed a complaint in the United States District Court for the District of Massachusetts requesting that the Board (pursuant to the Freedom of Information Act, 5 U.S.C. § 552) be ordered to divulge information which it had collected in its investigation of the University's election complaint. The district court, after issuing and then dissolving a temporary restraining order, found that the information sought by the University should not be disclosed.
 
 
 15
 These three cases stem from the University's petition to review and set aside the order of the Board and the Board's cross-petition for enforcement of its order, the Union's petition for review of the denial of extraordinary relief, and the University's appeal from the order of the district court.
 
 
 16
 THE NATIONAL LABOR RELATIONS BOARD AND ITS ROLE IN HIGHER EDUCATION
 
 
 17
 The Board ended its longtime policy of refusing to take jurisdiction over nonprofit higher educational institutions in Cornell University, 183 NLRB 329, 331 (1970). See Columbia University, 97 NLRB 424 (1951). This court first faced the significant questions which arise from the assertion of jurisdiction over post secondary institutions in NLRB v. Wentworth Institute, 515 F.2d 550 (1st Cir. 1975). In that case, we considered and answered in the affirmative the questions of whether an institution of higher education was an "employer" under the National Labor Relations Act, section 2(2), 29 U.S.C. § 152(2), and whether the institution's faculty were employees within the meaning of section 2(3), rather than supervisors under section 2(11), 29 U.S.C. § 152(3) and (11).
 
 
 18
 In considering this major policy change by the Board, we recognized that: "The declared purpose of the Act is to eliminate obstructions upon commerce caused by labor unrest . . . and in dealing with employer operations whose effect upon commerce has grown over time the Board believes that it is endowed with discretion to exercise a fuller measure of its conferred jurisdiction." Id. at 554. In holding that Wentworth's faculty members were not managerial, we specifically refrained from "comment(ing) on the Board's developing views on the significance of a substantial faculty role in decisions on curricula, admissions, hiring, degree requirements, and other educational policy matters." Id. at 557. We must now address some of these matters, at least with respect to department chairpersons.
 
 
 19
 Since the Board's first entry into the field of higher education, the exposure of the nation's universities to organizational efforts has grown rapidly,[2] and the role of the Board in the University setting has engendered a great deal of comment and criticism.[3] Much has been made by the Board's critics of the special governance structure in universities and the general inapplicability of its rules developed for private industry to the academic community, and the University here has, quite understandably, seized on this general criticism to support its case. We are bound to observe that some of the problems that arise in academia might better be addressed by rulemaking than by an ad hoc, case-by-case determination. But we must also note that the Board's transfer of its private industry experience and rules to the university setting was only natural and is consistent with the common law method of applying time-tested legal principles to new situations.
 
 
 20
 ARE DEPARTMENT CHAIRPERSONS SUPERVISORS WITHIN THE MEANING
 
 
 21
 OF SECTION 2(11) OF THE NATIONAL LABOR RELATIONS
 
 
 22
 ACT OR MANAGERIAL EMPLOYEES?
 
 
 23
 Section 2(11) of the NLRA requires exclusion of "supervisory" employees from collective bargaining units and defines a "supervisory" employee as
 
 
 24
 any individual having authority in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibility to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment.
 
 
 25
 The Board found that the department chairpersons were "employees" rather than "supervisors" and thus properly included in the bargaining unit.
 
 
 26
 Our analysis of whether chairpersons are excluded supervisors or managerial employees looks to the degree of control exercised by chairpersons over other bargaining unit personnel and the relative amount of interest they have in furthering the policy of the administration as opposed to the members of the bargaining unit.
 
 
 27
 The question of who are supervisors or managerial employees is one of fact for the Board, Stop & Shop Companies, Inc. v. NLRB, 548 F.2d 17, 18 (1st Cir. 1977); NLRB v. Magnesium Casting Co., 427 F.2d 114, 117 (1st Cir. 1970), aff'd, 401 U.S. 137, 91 S.Ct. 599, 27 L.Ed.2d 737 (1971), and the expertise of the Board in dealing with the gradations of authority between "supervisors" and "employees" can be so subtle that determining who is a supervisor must "as a practical matter" involve "a large measure of informed discretion." NLRB v. Swift & Co., 292 F.2d 561, 563 (1st Cir. 1961).
 
 
 28
 In this case, the Board's determination that the department chairpersons did not exercise supervisory authority over unit personnel and that whatever supervisory authority they did exercise over nonunit, support personnel was insufficient to render them supervisors, must be upheld.
 
 
 29
 Keeping in mind the substantial evidence test, our review of the record discloses the following facts which supply a firm footing to the Board's findings. The appointment and reappointment of full-time faculty is by approval of the trustees upon the written recommendation of the president, the academic vice-president, and the dean concerned. The department chairperson makes a recommendation, which is followed more often than not, "only after consultation by him with all full professors with tenure of that Department." Faculty Manual, Pet. Ex. 43 (p. VII-2). Although there are varying procedures used by the over eighty chairpersons, the department chairperson's recommendation, as is the case in other universities, is the result of such consultation. Reappointment, promotion, and discipline of the faculty are finally determined by the President and Board of Trustees based on recommendations by the department chairperson who consults with and usually obtains the consensus of the tenured faculty members of the department. In each of these areas, the Board was entitled to find that the chairperson's recommendations were not "effective" or that he/she was acting "in the interest" of the faculty, not of the employer.
 
 
 30
 While department chairpersons are selected by the appropriate dean, the selection is usually based on a consensus of the faculty of the department. The Board could also have found that the chairpersons were not acting as supervisors with respect to their department budgets since they lacked discretion in formulating them. Based on this evidence, the Board was warranted in finding that the department chairpersons are not supervisors. Indeed, the selection process for department chairpersons is such that they represent the interests of the tenured professors of the department rather than the University.
 
 
 31
 The record also amply supports the Board's finding that University chairpersons spend less than 50% of their time supervising nonunit employees.[4] The chairperson is normally a member of the department who takes on the assignment for varying periods of time without losing standing in the department. A frequent career step for a department chairperson is to return to a position as full-time professor.
 
 
 32
 DID THE BOARD ABUSE ITS DISCRETION IN EXCLUDING THE
 
 FACULTIES OF THE SCHOOLS OF LAW, GRADUATE
 DENTISTRY, AND MEDICINE AND PART-TIME
 
 33
 FACULTY FROM THE BARGAINING UNIT?
 
 
 34
 The determination of the composition of a bargaining unit is almost entirely a factual determination for the Board. South Prairie Construction Co. v. Operating Engineers, 425 U.S. 800, 96 S.Ct. 1842, 48 L.Ed.2d 382 (1976); NLRB v. Diamond Standard Fuel Corp., 437 F.2d 1163 (1st Cir. 1971). We have said that a unit which the Board finds appropriate is entitled to stand unless it is a "crude gerrymander." S. D. Warren Co. v. NLRB, 353 F.2d 494, 498 (1st Cir. 1965), cert. denied, 383 U.S. 958, 86 S.Ct. 1222, 16 L.Ed.2d 300 (1966). The party opposing the Board's unit determination must show that the unit selected is "clearly not appropriate." Banco Credito v. NLRB, 390 F.2d 110, 112 (1st Cir.), cert. denied, 393 U.S. 832, 89 S.Ct. 101, 21 L.Ed.2d 102 (1968).
 
 
 35
 The University's best case with respect to the exclusion of the three professional school faculties lies with the School of Law. Unlike the Schools of Medicine and Graduate Dentistry, the law school is on the University's main, Charles River, campus. It shares a building with another school which was included in the bargaining unit, the School of Education, and its dean reports to the same academic vice-president as do most of the schools which are in the bargaining unit. None of these factors apply to the other two excluded schools. The Schools of Graduate Dentistry and Medicine are on a separate campus, approximately a mile away from the main campus, and report to the Academic Vice-President for Health Affairs.[5] As a result of these differences, there is relatively little interaction between the faculty members from the Schools of Graduate Dentistry and Medicine and the members of the bargaining unit as compared with the School of Law.
 
 
 36
 The Board's determination concerning the School of Law was neither novel nor unfounded.[6] The principal fault which can be found with its determination is that some of the reasons given for separating the law school from the other Charles River campus schools would be equally applicable to the University's other professional schools, e.g., the Schools of Engineering, Public Communications, Management, and, perhaps, even the Schools of Fine Arts, Nursing, and Sargent College of Allied Health. Each of these schools occupies a separate building less centrally located on the campus than the one occupied by the School of Education and the School of Law. However, we do not review the Board's decision de novo, but must determine only if it has abused its discretion. Diamond Standard, supra, 437 F.2d at 1164; S. D. Warren Co., supra, 353 F.2d 494; Swift & Co., supra, 292 F.2d at 563. It can be argued, based on the above factors, that the Board should have included the law school and, perhaps even the Schools of Graduate Dentistry and Medicine within the bargaining unit. But these facts can also be used to argue that the Board should have excluded the other professional schools. See Fordham University, supra, 193 NLRB 134. But, however viewed, these facts do not establish conclusively that the Schools of Law, Graduate Dentistry and Medicine must be part of the bargaining unit.
 
 
 37
 Moreover, there are significant differences between the law school and the other graduate schools included in the bargaining unit. It occupies its own segment of the building which it shares with the School of Education with a separate entrance and separate lobby and elevators. The dean of the law school, not the University Space Planning Committee, controls the assignment of rooms and space in the law school area. It has its own admissions office and registrar and keeps its own records. The law school has a separate library in a separate building with access only through buildings or areas controlled by it. It makes independent recommendations for financial aid, has a separate academic calendar and a distinct and separate graduation ceremony.
 
 
 38
 The law school, like the Schools of Dentistry and Medicine, has significant independent resources, although its budget is reviewed in the same manner as the other schools. Its endowment, exceeded only by the Schools of Medicine and Dentistry in the entire University, is the largest of any of the schools on the Charles River campus. The law school maintains its own fund raising mechanism, and it does not divide contributions with the University as do the other schools on the main campus. These differences are important elements in determining what the faculties of the respective schools can realistically expect from collective bargaining.
 
 
 39
 The difference in faculty salaries between the law school and the included schools must have played a key role in the Board's decision. While the average salary for law professors is $27,000, the average salary for all Charles River campus professors, including the law school, is approximately $17,000. We must also take judicial notice of the fact that many law school professors are able to supplement their incomes either by the practice of law, publishing legal material or other legally related activities.
 
 
 40
 Tenure, one of the most important quasi-economic issues for bargaining, is obtained on the average in three years at the law school while it takes approximately six years at the other Charles River Campus schools.[7]
 
 
 41
 Viewed as a whole, we cannot say that the Board's decision as to the law school was arbitrary or not based on substantial evidence. Since the Schools of Medicine and Graduate Dentistry are physically separate from the main campus and since all of the factors discussed as to the law school are even more applicable to them, it follows that the Board's ruling is sustained as to them.
 
 THE PART-TIME FACULTY
 
 42
 The Board excluded all part-time faculty. Since its decision in New York University, supra, 205 NLRB 4, 6, 7, it has consistently excluded all part-time faculty not employed in "tenure track" positions.[8] The Board found that "generally only full-time members are eligible (for tenure)." The reason for the exclusionary rule is that they have "no mutuality of interest (with full-time faculty in) (1) compensation, (2) participation in University Government, (3) eligibility for tenure, and (4) working conditions." New York University, supra, 205 NLRB at 6-7. To this we add that the part-time faculty do not share the same benefit package nor are they generally as dependent on the University either for financial support or for continuing their careers and life style. These reasons, and others cited by the Board, are more than sufficient to sustain the exclusion of part-time faculty from the bargaining unit.
 
 
 43
 DID THE BOARD ABUSE ITS DISCRETION IN OVERRULING THE
 
 
 44
 UNIVERSITY'S ELECTION OBJECTION WITH RESPECT TO AN
 
 ARTICLE CONCERNING PRESIDENT JOHN SILBER
 
 45
 IN THE AAUP BULLETIN?
 
 
 46
 One of the lead articles appearing in the AAUP Bulletin in April of 1975 was a book review by Alan Grob entitled "Invasion In Austin." The book under review, "Our Invaded Universities," portrayed John Silber, now President of Boston University and then Dean of Arts and Sciences at Texas University, in a favorable light. Professor Grob's article was critical of the portrait and accused Silber of unfairly interfering with the rights of an instructor in an employment dispute with the University of Texas. The University claims that the article was, at the least, inaccurate and, at the most, a deliberate distortion of the truth. It asserts that, since it did not learn of the article until May 8 and the election was scheduled and held on May 14, it had no opportunity to reply to the charges. The Board's policy has been to set aside an election where there has been a material misrepresentation of fact made by one who had special knowledge or was in a position to know the true facts and where there was no opportunity to correct the misrepresentation of fact made by one who had special knowledge or was in a position to know the true facts and where there was no opportunity to correct the misrepresentation before the election. Celanese Corporation of America v. NLRB, 291 F.2d 224, 226 (7th Cir. 1961).
 
 
 47
 Had this article been published in another setting, we might well find that it impaired the employees' freedom of choice in the election, but it was published in a union organ by a writer who had no personal knowledge of the facts. See NLRB v. Gilmore Industries, Inc., 341 F.2d 240, 241 (6th Cir. 1965); NLRB v. Houston Chronicle Publishing Co., 300 F.2d 237 (5th Cir. 1962); NLRB v. Shirlington Supermarket, 224 F.2d 649 (4th Cir.), cert. denied, 350 U.S. 914, 76 S.Ct. 198, 100 L.Ed. 801 (1955). It concerned an event that took place seven to eight years prior in a different university. The voters in this election were as sophisticated and literate a group as ever votes in a union certification election, and they had the advantage of four and one-third years of experience under the administration of the man criticized in the article. One of the circumstances which we must take into account is the sophistication of the work force involved. In Modine Manufacturing Company, 203 NLRB 527 (1973), enforced, 500 F.2d 914 (8th Cir. 1974), the Board stated:
 
 
 48
 We must, we think, be allowed a reasonably broad area of discretion in judging whether the alleged misrepresentation is prima facie sufficient to justify either a hearing or a rerun election. There are many intangibles going into such a judgment. We may, for example, take into account the current degree of sophistication of the voters at a particular time or in a particular area of the country. We may also call into play the expertise we develop in observing through our own eyes and through the eyes of regional personnel indirectly involved in the conduct of some 9,000 elections a year. For we are faced in each case with a judgment both as to how material alleged misrepresentations in a given subject area may be in a particular place and in a background of the tenor of the particular time. We may also appropriately bear in mind the character of the particular work force involved and what we observe to be the reputation and the relative strength of the employer or the labor organization alleged to have made a material misrepresentation. Id. at 531.
 
 
 49
 Given this particular unit and the time span, there is no reason why the article should have prejudiced the faculty or influenced its voting unfairly.
 
 FREEDOM OF INFORMATION ACT ISSUE
 
 50
 The fourth issue is whether the University is entitled to material gleaned by the Board in its investigation of the University's objections to the Board certification election. The Board argues, and the district court found, that the information which is sought comes within Exemption 7(A) of the Freedom of Information Act. We have previously decided two cases on the question of the FOIA's applicability to information garnered during an investigation of an unfair labor practice charge, New England Medical Center v. NLRB, 548 F.2d 377 (1st Cir. 1976), and Goodfriend Western Corp. v. Fuchs, 535 F.2d 145 (1st Cir.), cert. denied, 429 U.S. 834, 97 S.Ct. 257, 50 L.Ed.2d 178 (1976). Because of the extensive analysis in New England Medical Center and in Title Guarantee Co. v. NLRB, 534 F.2d 484 (2d Cir.), cert. denied, 429 U.S. 834, 97 S.Ct. 98, 50 L.Ed.2d 99 (1976), we deal only with the arguments which the University advances in attempting to distinguish this case from those cited above.[9]
 
 
 51
 Boston University attempts to distinguish its case from New England Medical Center and Goodfriend Western Corporation on the basis that it seeks only material and facts which were gathered pursuant to the University's objection to the Board certification election, not the material gathered pursuant to the unfair labor practice charges made by the Union as was the situation in the cited cases. At the outset, we note that the factors bearing on the "closed" election objection files are little different from those concerning the "closed" unfair labor practice charge in New England Medical Center, supra, 548 F.2d at 385-387.
 
 
 52
 The University itself points out in its brief that the election objection case and the pending enforcement and unfair labor practice actions are really one and the same when it asserts that the "principal purpose in seeking the information is an unfair labor practice case in which the university is the respondent." Brief at 10, 25. In its brief at pages 19-20, the University states:
 
 
 53
 The only way the University can obtain judicial review of the representation proceeding, the conduct of which the University has objected to numerous times, is by refusing to bargain with the Board-certified union. . . . The pending enforcement proceeding against Boston University . . . is, in essence, a procedural device to test the Board's certification . . . .
 
 
 54
 Thus, the University's argument that the case is closed and that the Board's case can no longer be frustrated by revealing the contents of its files is internally inconsistent. As the Tenth Circuit said in AMF Head v. NLRB, 564 F.2d 374, 375 (10th Cir. 1977):
 
 
 55
 It would be anomalous indeed for us to hold at this juncture that the exemption ceases to protect once the proceedings before the NLRB have ended, for this is not the end of the enforcement proceedings. To hold in accordance with the argument of the AMF Head Division would mean that the F.O.I.A. machinery could be used for the purpose of obtaining information in aid of the review of the unfair labor practice proceedings in this court. Various evidence would be tendered in this, an appellate court, in an effort to obtain a reversal. Thus, the discovery effort would be employed to affect the outcome of the enforcement proceedings. It is to be noted at the time of the trial court's decision that the present body of law had not developed. Furthermore, there is no assurance that the NLRB cause will not be remanded to that Board for further proceedings.
 
 
 56
 Even if we remand, the appropriate procedure would be for the University, if it still wants the information, to return to the Board and make a new request for the information on the basis of the new factual situation. Review of this new determination would, of course, be available in the district court. See New England Medical Center, supra, 548 F.2d at 387 (denial of rehearing).
 
 
 57
 While we concur in part with the University's contention that "employee fear" is not a significant element of this case because the materials sought are not employee statements, we remain unconvinced that the sound reasons which underlie the decisions cited above are inapplicable here. The principal question here is not one of protecting the sanctity of statements made by employees with an expectation of confidentiality.[10] The key question in examining the claim under 7(A) "is whether production would 'interfere' with the pending enforcement proceeding," New England Medical Center, supra, 548 F.2d at 382, or upset the " 'delicate' . . . balance existing between employer and employee in labor proceedings." Id. at 387, citing Title Guarantee, supra, 534 F.2d at 492. We think it would. The Board's certification of the election is a closed file only in the most technical sense since the University has announced its intention to rely on its objections as a defense to the unfair labor practices charge. If the University is permitted to see the Board's files from the election case, the University will be able to determine the boundaries of the Board's information; that, in turn, "will 'interfere' with Board proceedings by enabling a possible violator to construct defenses." New England Medical Center, supra, 548 F.2d at 386. Here, "the closed file documents remain fully relevant to a specific pending enforcement proceeding, although, to be sure, not the one for which they were precisely intended." Id. at 385.
 
 
 58
 DID THE BOARD ERR IN DENYING THE UNION'S REQUEST FOR
 
 
 59
 EXTRAORDINARY RELIEF?
 
 
 60
 The Union attacks as insufficient the Board's prospective bargaining order and complains that it erred in denying its request for extraordinary relief. Its complaint is based on the premise that the University's appeals were dilatory and frivolous, designed only to avoid its statutory obligation to bargain with the duly elected Union.
 
 
 61
 Because of the Board's ad hoc and, at times, inconsistent rulings in cases involving higher institutions of learning, we cannot say that the position of the University was either frivolous or dilatory.
 
 
 62
 The question of whether chairpersons are employees or supervisors has always been a difficult one for the Board, and the determination of the composition of a bargaining unit in a university setting remains unsettled and may never be susceptible of a fixed rule.
 
 
 63
 While we do not look with favor upon the attempt by attorneys to use the Freedom of Information Act as a discovery tool, we have become resigned to the fact that it has now become almost a matter of rote to assert it in cases involving government agencies.
 
 
 64
 The orders of the National Labor Relations Board in Nos. 77-1143 and 77-1375 are to be enforced, and the district court is affirmed in No. 77-1226.
 
 
 
 [1]
 The unit found appropriate was:
 All full-time teaching members of the faculty at Boston University, including department and division chairmen, area chairmen in the School of Theology, sequence coordinators in the School of Social Work, coordinators in the School of Nursing, the director of the Teacher Training Project in Sargent College, the directors of the African Studies Center, the Afro-American Studies Program, the Center for Latin-American Development Studies, the American and New England Studies Program, the Center for Applied Social Science, the Boston University Center for the Philosophy and History of Science, the Continuing Education Department in the School of Nursing, the University Professors Program, faculty on leave (who are visiting faculty at another education institution and who are otherwise eligible), and faculty in the Overseas Program (who taught at the University immediately prior to taking assignment in said Overseas Program for a definite period of time and who are expected to return to the school or college of the University in Boston from which they came), but excluding all part-time faculty, all officers of the University, deans, associate deans, assistant deans, administrative support personnel, nonteaching professionals, librarians, graduate assistants, teaching fellows, student employees, nonprofessional employees, coaches (who are not otherwise eligible for inclusion), directors of the schools of music, visual arts and theatre arts in the school for the Arts, visiting faculty, all faculty, department chairmen and program directors in the Schools of Law, Medicine and Graduate Dentistry, all other employees, guards and supervisors as defined in the Act.
 
 
 [2]
 See, e. g., Trustees of Boston University v. NLRB, 548 F.2d 391 (1st Cir. 1977); NLRB v. Mercy College, 536 F.2d 544 (2d Cir. 1976); NLRB v. Wentworth Institute, supra, 515 F.2d 550; University of Vermont and State Agricultural College, 223 NLRB 423 (1976); Yeshiva University, 221 NLRB 1053 (1975), enf't pd'g, (2d Cir. No. 77-4182); Rensselaer Polytechnic Institute, 218 NLRB 1435 (1975); Fordham University, 214 NLRB 971 (1974); University of Miami, 213 NLRB 634 (1974); Point Park College, 209 NLRB 1064 (1974); University of San Francisco, 207 NLRB 12 (1973); Fairleigh Dickinson University, 205 NLRB 673 (1973); University of Chicago Library, 205 NLRB 220 (1973), enf'd mem., 506 F.2d 1402 (7th Cir. 1974); New York University, 205 NLRB 4 (1973); Syracuse University, 204 NLRB 641 (1973); The Catholic University of America, 201 NLRB 929 (1973); Rosary Hill College, 202 NLRB 1137 (1973); Claremont University Center, 198 NLRB 811 (1973); Tusculum College, 199 NLRB 28 (1972); Florida Southern College, 196 NLRB 888 (1972); Adelphi University, 195 NLRB 639 (1972); University of Detroit, 193 NLRB 566 (1971); Fordham University, 193 NLRB 134 (1971); University of New Haven, Inc., 190 NLRB 478 (1971); Long Island University (Brooklyn Center), 189 NLRB 909 (1971); C. W. Post Center of Long Island University, 189 NLRB 904 (1971); Cornell University, supra, 183 NLRB 329
 
 
 [3]
 See e. g., Kenneth Kahn, The NLRB and Higher Education: The Failure of Policy Making Through Adjudication, 21 U.C.L.A.L.Rev. 63, 84-101. See also NLRB v. Wyman-Gordon Co., 394 U.S. 759, 764-766, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1964); Bell Aerospace v. NLRB, 475 F.2d 485, 495-497 (2d Cir. 1973), modified, 416 U.S. 267, 94 S.Ct. 1757, 40 L.Ed.2d 134 (1974)
 
 
 [4]
 Boston University objects to the Board's use of the 50% rule on two grounds: one, that there is not substantial evidence in the record to support its finding that department chairpersons actually devoted less than 50% of their time to supervision, and two, that the rule is unrealistic and unworkable in a university setting and should be invalidated as a matter of law. We think that the record amply supports the finding of the Board that the time spent in supervisory duties "reached a maximum of five to ten percent among the many chairmen who testified." In this case, the Board did not rely on the 50% rule. We intimate no view as to the validity of the rule where the supervisory time closely approaches or exceeds 50%
 
 
 [5]
 Several other schools which were included in the bargaining unit also report to the Academic Vice-President for Health Affairs. They are: School of Nursing, School of Social Work, Sargent College of Allied Health Professions
 
 
 [6]
 Some other decisions in which law schools were kept out of university faculty units in varying circumstances are: University of Miami, supra, 213 NLRB 634; University of San Francisco, supra, 207 NLRB 12; Catholic University, supra, 201 NLRB 929; Fordham University, supra, 193 NLRB 134. In Fairleigh- Dickinson, supra, 205 NLRB 673, the Board included the dental faculty in a unit of university faculty
 
 
 [7]
 We do not think that the testimony that the law school faculty maintains closer ties to its profession than that of the other schools is particularly helpful. Nor do we consider faculty luncheon customs of probative value on this issue
 
 
 [8]
 Decisions in which part-time faculty have been included in the unit are all cases prior to New York University, supra, 205 NLRB 4. Since then, the policy has been to keep the part-time faculty excluded from the collective bargaining units of full-time faculty. See University of San Francisco, supra, 207 NLRB 12; Yeshiva University, supra, 221 NLRB 1053
 
 
 [9]
 In Robbins Tire and Rubber Co. v. NLRB, 563 F.2d 724 (5th Cir. 1977), cert. granted, --- U.S. ----, 98 S.Ct. 1231, 54 L.Ed.2d ---, 46 U.S.L.W. 3511 (2/21/78), the Fifth Circuit considered a similar situation to the ones here and in New England Medical Center, Goodfriend Western Corp., and Title Guarantee and held that it could not
 agree with the Board's assertion that disclosure of witnesses' statements would inevitably interfere with enforcement proceedings even in the sense that it would always allow litigants greater discovery than they otherwise would obtain. Robbins Tire and Rubber Co., supra, 563 F.2d at 730.
 However, the Fifth Circuit has consistently ordered broader discovery than the Board is generally willing to grant and broader than has been forced on the Board by other circuits. See e.g., NLRB v. Rex Disposables, 494 F.2d 588, 592 (5th Cir. 1974); NLRB v. Miami Coca-Cola Bottling Co., 403 F.2d 994 (5th Cir. 1968); NLRB v. Safway Steel Scaffolds Co., 383 F.2d 273 (5th Cir. 1967), cert. denied, 390 U.S. 955, 88 S.Ct. 1052, 19 L.Ed.2d 1150 (1968). See also Charlotte-Mecklenburg Hospital Authority v. Lowell W. Perry, Chairman of the Equal Opportunity Commission, etc., 571 F.2d 195, Nos. 76-2272 and 2273 (4th Cir. April 4, 1977). Compare NLRB v. Hardeman Garment Corp., 557 F.2d 559 (6th Cir. 1977); New England Medical Center, supra, 548 F.2d at 383; Roger J. Au & Son, Inc. v. NLRB, 538 F.2d 80 (3d Cir. 1976); NLRB v. Martin A. Gleason, Inc., 534 F.2d 466, 481 (2d Cir. 1976); Combs v. State of Tenn., 530 F.2d 695 (6th Cir.), cert. denied, 425 U.S. 954, 96 S.Ct. 1731, 48 L.Ed.2d 198 (1976); D'Youville Manor v. NLRB, 526 F.2d 3, 7 (1st Cir. 1975); NLRB v. Lizdale Knitting Mills, Inc., 523 F.2d 978 (2d Cir. 1975); NLRB v. Interboro Contractors, Inc., 432 F.2d 854, 859-869 (2d Cir. 1970), cert. denied, 402 U.S. 915, 91 S.Ct. 1375, 28 L.Ed.2d 661 (1971); Electromec Design and Development Co. v. NLRB, 409 F.2d 631, 635 (9th Cir. 1965).
 We have read Charlotte-Mecklenburg Hospital Authority v. Perry, 16 F.E.P. 680, 571 F.2d 195 (4th Cir. Jan. 26, 1978), submitted by the attorney for Boston University. We are also aware that the United States Supreme Court has granted certiorari in the Fifth Circuit case, Robbins Tire and Rubber Co. v. NLRB, supra. Since the rule in this circuit has been well established, we continue to adhere to it.
 
 
 [10]
 The Board in its FOIA brief at pages 21-26 argues the applicability of Exemption 5:
 (5) inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency.
 Because of our findings with regard to Exemption 7(A), no discussion of Exemption 5 is necessary.